PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-2808
_____

IN RE: ABC LEARNING CENTRES LIMITED,
n/k/a ZYX LEARNING CENTRES LIMITED;
A.B.C. USA HOLDINGS PTY LTD,
Debtors in Foreign Proceedings

RCS Capital Development, LLC.,
Appellant

_____

On Appeal from the United States District Court
for the District of Delaware
D.C. Civil Action No. 1-11-cv-00245
(Honorable Richard G. Andrews)
_____

ARGUED: March 5, 2013

Before:  SCIRICA, JORDAN, and ROTH, *Circuit Judges*.

(Filed:  August 27, 2013)

Carson T.H. Emmons, Esq.
Craig M. LaChance, Esq. [ARGUED]

Daryl M. Williams, Esq.
Baird, Williams & Greer
6225 North 24th Street
Suite 125
Phoenix, AZ  85016

Garvan F. McDaniel, Esq.
Bifferato Gentilotti
800 North King Street
Plaza Level
Wilmington, DE  19801

       *Counsel for Appellant*

Ryan M. Bartley, Esq.
Young, Conaway, Stargatt & Taylor
1000 North King Street
Rodney Square
Wilmington, DE  19801

Howard Seife, Esq. [ARGUED]
Chadbourne & Parke
30 Rockefeller Plaza
New York, NY  10012

       *Counsel for Appellees*

—————————————

OPINION OF THE COURT
—————————————

SCIRICA, *Circuit Judge*.

RCS Capital Development LLC appeals from an order of recognition of an Australian insolvency proceeding under Chapter 15 of the Bankruptcy Code, and an order staying actions against the debtor, ABC Learning Centres, and its property in the United States. We must determine whether the Australian insolvency proceeding should be recognized as a foreign main proceeding under Chapter 15 of the Bankruptcy Code, and whether the debtor's fully-encumbered property in the United States is subject to the automatic stay under 11 U.S.C. § 1520.

## I.

ABC Learning Centres Ltd. is a publicly-traded Australian company that provided child care and educational services in Australia, the United States and other countries through its 38 subsidiaries. It conducted business in the United States principally through its subsidiaries, ABC Developmental Learning Centres (USA) Inc. (ABC Delaware) and the Learning Care Group. In June 2008, RCS Capital Development LLC contracted with ABC Delaware to develop child care facilities in the United States, and ABC guaranteed ABC Delaware's loan obligations. RCS won a $47 million verdict on a breach of contract claim against ABC Delaware in Arizona state court on May 14, 2010. RCS is a defendant to a Nevada lawsuit brought by ABC Learning and ABC Delaware, seeking $30 million.

In November 2008 ABC's directors entered into Voluntary Administration in Australia, and appointed administrators to determine whether ABC could be

restructured to address its insolvency, or whether it had to be liquidated.[1] Entering into Voluntary Administration breached ABC's loan agreements with its secured creditors. This breach triggered the secured creditors' rights to realize their assets through the receivership process prescribed by Australia's Corporations Act. Corporations Act 2001 s 554E(3) (Austl.) (hereinafter "Corporations Act"). The secured creditors exercised that right and appointed a receiver. ABC was entirely leveraged, so the value of all its assets was encumbered by its secured creditors' charges.[2]

ABC's directors voted to enter liquidation proceedings on June 2, 2010, and appointed two of the administrators as the liquidators to wind up the company. The receivership continued through the commencement of liquidation proceedings, and operated in tandem with the winding up. ABC's liquidators granted the receiver permission to manage and operate ABC. A liquidator realizes assets for the benefit of all the creditors, investigates charges claimed by the secured creditors, takes an accounting and payment of the value of assets the receiver realized beyond the amount of the debenture, and distributes assets on a pro rata basis among creditors of the same priority.

On May 26, 2010, the administrators-turned-liquidators petitioned the Bankruptcy Court of Delaware as ABC's foreign representatives for recognition of the

---

[1] Insolvency proceedings under Australia's Corporations Act of 2001 may commence by appointing an administrator to determine the company's solvency.

[2] Under Australian law, a charge is a security interest in property similar to a lien in the United States.

Australian insolvency proceedings under Chapter 15 of the Bankruptcy Code. The petition was filed before the Arizona verdict was rendered into judgment, and the immediate focus of the stay was ABC's suit against RCS in Nevada state court. The Bankruptcy Court found the liquidation was a foreign main proceeding that met the recognition requirements and did not manifestly contravene U.S. public policy. The Bankruptcy Court ordered recognition and an automatic stay of actions against ABC and ABC's property within the United States' jurisdiction. The Bankruptcy Court granted RCS's motion to lift the stay for the purpose of rendering its Arizona verdict to judgment, and applying the judgment against the Nevada action. The District Court of Delaware upheld the Bankruptcy Court's orders, noting that RCS was granted all the relief it initially sought. RCS appeals from the District Court's order.

## II.[3]

Congress created Chapter 15 of the Bankruptcy Code in Title VIII of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. 11 U.S.C. § 1501 *et seq.* Under Chapter 15, U.S. bankruptcy courts must recognize a foreign insolvency proceeding when it is "a collective judicial

---

[3] The Bankruptcy Court had jurisdiction under 11 U.S.C. § 105. The District Court had jurisdiction over the appeal from the Bankruptcy Court's final order under 28 U.S.C. § 158(a). We have jurisdiction over this appeal from the final order of the district court under 28 U.S.C. § 158(d). We review the legal standards applied by the district court and the bankruptcy court de novo. *In re DeSeno*, 17 F.3d 642, 643 (3d Cir. 1994).

or administrative proceeding in a foreign country . . . under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation." 11 U.S.C. § 101(23); *id.* § 1517(a).[4] The statute requires recognition when the foreign proceeding meets the requirements of section 1502. *Id.* § 1517(a). "Upon recognition of a foreign [main] proceeding . . . sections 361 and 362 apply with respect to the debtor and the property of the debtor that is within the territorial jurisdiction of the United States." *Id.* § 1520(a)(1). Section 362 stays "the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title." *Id.* § 362(a)(2).

Congress enacted Chapter 15 to provide effective mechanisms for dealing with cases of cross-border insolvency with the following objectives:

> (1) cooperation between . . . courts of the United States, . . . and the courts   and other competent authorities of foreign countries involved in   cross-border insolvency cases;
> (2) greater legal certainty for trade and investment;

---

[4] A foreign representative must petition for recognition, which shall be granted where the proceeding is pending in the country where the debtor has the center of its main interests (main) or where it has an establishment (nonmain), the foreign representative is a person or body, and where the petition meets § 1515 filing requirements. 11 U.S.C. § 1517(a).

> (3) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor;
> (4) protection and maximization of the value of the debtor's assets; and
> (5) facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

11 U.S.C. § 1501; *see also* UNCITRAL Model Law on Cross-Border Insolvency preamble (stating nearly identical purposes). "Title VIII is intended to provide greater legal certainty for trade and investment as well as to provide for the fair and efficient administration of cross-border insolvencies, which protects the interests of creditors and other interested parties, including the debtor. In addition, it serves to protect and maximize the value of the debtor's assets." H.R. Rep. No. 109–31(I), at 105 *reprinted in* 2005 U.S.C.C.A.N. 88, 169 (2005). The statute adopts, nearly in its entirety, the Model Law on Cross-Border Insolvency promulgated in 1997 by the United Nations Commission on International Trade Law (UNCITRAL). *Id.*

UNCITRAL developed the Model Law on Transnational Insolvency in response to the challenges of multinational bankruptcies where multiple insolvency regimes lacked effective mechanisms for coordination. Multiple systems limited the ability of any one bankruptcy regime to protect assets against dissipation, and allowed creditors to skip ahead of their priority by seizing assets in foreign jurisdictions. The UNCITRAL Legislative Guide

explains the Model Law was designed to address

> inadequate and inharmonious legal approaches,
> which hamper the rescue of financially troubled
> businesses, are not conducive to a fair and
> efficient administration of cross-border
> insolvencies, impede the protection of the assets
> of the insolvent debtor against dissipation and
> hinder maximization of the value of those
> assets. Moreover, the absence of predictability
> in the handling of cross-border insolvency cases
> impedes capital flow and is a disincentive to
> cross-border investment. . . . Fraud by insolvent
> debtors, in particular by concealing assets or
> transferring them to foreign jurisdictions, is an
> increasing problem, in terms of both its
> frequency and its magnitude.

U.N. Comm'n on Int'l Trade Law, UNCITRAL Legislative Guide on Insolvency Law, at 310, U.N. Sales No. E.05.V.10 (2005). Both the United States and Australia have adopted the Model Law.

The American Law Institute's Global Principles for Cooperation in International Insolvency Cases elaborates "the overriding objective [is to] enable[] courts and insolvency administrators to operate effectively and efficiently in international insolvency cases with the goals of maximizing the value of the debtor's global assets, preserving where appropriate the debtors' business, and furthering the just administration of the proceeding." American Law Institute, Global Principles for Cooperation in Int'l Insolvency Cases

1.1 (2012).[5] "[T]he emphasis must be on ensuring that the insolvency administrator, appointed in that proceeding, is accorded every possible assistance to take control of all assets of the debtor that are located in other jurisdictions." *Id.* at cmt. to Global Principle 24. Chapter 15 creates an ancillary proceeding in the United States to provide support to the foreign insolvency administrator. Jay Lawrence Westbrook, *Chapter 15 at Last*, 79 Am. Bankr. L.J. 713, 726 (2005). The goal is to direct creditors and assets to the foreign main proceeding for orderly and fair distribution of assets, avoiding the seizure of assets by creditors operating outside the jurisdiction of the foreign main proceeding.

The Model Law reflects a universalism approach to transnational insolvency. It treats the multinational bankruptcy as a single process in the foreign main proceeding, with other courts assisting in that single proceeding. Westbrook, *supra*, at 715. In contrast, under a territorialism approach a debtor must initiate insolvency actions in each country where its property is found. *Id.* This approach is the so-called "grab rule" where each country seizes assets and distributes them according to each country's insolvency proceedings. *Id.*; *see also* Andrew T. Guzman, *International Bankruptcy: In Defense of Universalism*, 98 Mich. L. Rev. 2177, 2179 (2000).

Chapter 15 embraces the universalism approach. The ancillary nature of Chapter 15 proceedings "emphasizes the

---

[5] The ALI principles "provide authority for resolution of a number of issues not fully addressed by Chapter 15 or addressed only in part." Jay Lawrence Westbrook, *Chapter 15 at Last*, 79 Am. Bankr. L.J. 713, 714 (2005).

United States policy in favor of a general rule" that our courts "act . . . in aid of the main proceedings, in preference to a system of full bankruptcies . . . in each state where assets are found." H.R. Rep. No. 109–31(I), at 109 (2005) *reprinted in* 2005 U.S.C.C.A.N. 88, 171. Congress rejected the territorialism approach, the "system of full bankruptcies," in favor of aiding one main proceeding. *Id.* "The purpose is to maximize assistance to the foreign court conducting the main proceeding." *In re Fairfield Sentry Ltd. Litig.*, 458 B.R. 665, 678-79 (S.D.N.Y. 2011) (citing *In re Condor Ins. Ltd.*, 601 F.3d 319, 329 (5th Cir. 2010)). "Thus, a Chapter 15 court in the United States acts as an adjunct or arm of a foreign bankruptcy court where the main proceedings are conducted." *Id.*

Chapter 15 supplanted Section 304 of the Bankruptcy Code, which authorized courts to stay U.S. actions against companies or property subject to a foreign insolvency proceeding. 11 U.S.C. § 304 (2000) (*repealed by* Pub. L. 109-8. Title VIII, § 802(d)(3) (2005)). Section 304 relief was largely discretionary. *See In re Treco*, 240 F.3d 148, 155 (2d Cir. 2001) (explaining that Section 304 "by its terms requires an exercise of judicial discretion"). Chapter 15 improved predictability by mandating recognition when a foreign proceeding meets Section 1517 recognition requirements. Leif M. Clark, *Ancillary and Other Cross-Border Insolvency Cases Under Chapter 15 of the Bankruptcy Code* 10-11 (2008). Before the Model Law, many countries did not assist U.S. insolvency proceedings, even though the United States opened its courts to foreign representatives. *In re Condor Ins., Ltd.*, 601 F.3d 319, 321-22 (5th Cir. 2010). One of the reasons Congress changed so little of the wording in the Model Law was to endorse it wholesale, and encourage wide

adoption by other nations. Westbrook, *supra*, at 719. Mandatory recognition when an insolvency proceeding meets the criteria fosters comity and predictability, and benefits bankruptcy proceedings in the United States that seek to administer property located in foreign countries that have adopted the Model Law.

Chapter 15 also encourages communication and cooperation with foreign courts, and authorizes our courts to communicate directly with foreign courts. 11 U.S.C. § 1525. Foreign representatives can access U.S. courts to request enforcement of orders of the foreign proceeding and to stay actions against foreign debtors' property in the United States. *Id.* §§ 1509, 1520, 1521. Chapter 15 ancillary proceedings bring people and property beyond the foreign main proceeding's jurisdiction into the foreign main proceeding through the exercise of the United States' jurisdiction.

### A.

In Australia a company's directors may determine the company is insolvent and initiate liquidation proceedings. Corporations Act s 436A. Here, ABC went into Voluntary Administration, where the appointed administrators determined whether the company was salvageable. *Id.* s 438A. In this case, the administrators decided ABC should be liquidated, and two of the administrators became the liquidators, responsible for collecting and distributing the company's assets to the company's creditors. *Id.* ss 478, 556; Australian Sec. & Invest. Comm'n, *Liquidation: A Guide for Creditors* 2 (2012) *available at* www.asic.gov.au. Only unsecured creditors are barred from initiating or continuing legal proceedings against the company. Corporations Act s

471B-C. Secured creditors have their own proceeding where they may appoint a receiver to realize the secured assets, and distribute the proceeds to satisfy the debts that the property secured. *Id.* s 420.

Receivership can function in tandem with liquidation. *Id.* s 420C(1). Secured creditors may elect to surrender the secured assets to the liquidator, and receive distribution through the liquidation proceeding, or appoint a receiver to realize the assets. *Id.* s 554E(3). The receiver represents the interest of secured creditors, whereas the liquidator represents the interests of all the creditors. *Id.* s 420. The receiver's only duty to unsecured creditors is to sell the assets for a fair price. *Id.* s 420A. But the receiver does not operate entirely independently from the liquidator. The liquidator has authority to review the appointment of the receiver, and monitor the progress of the receivership. Australian Sec. & Invest. Comm'n., *Receivership: A Guide for Creditors* 4 (2008) *available at* www.asic.gov.au [hereinafter *Receivership*]. The receiver must pay to the company any amount realized above the amount of debt owed to the secured creditors.[6] *Id.* at 2; Corporations Act s 441EA. The liquidator investigates the charges claimed by secured creditors, and may challenge asserted charges. *Receivership*, *supra*, at 4. The liquidator may also grant permission to the receiver to operate and manage the company while the liquidator proceeds with winding up the company. Corporations Act s 420C(1)(a).

---

[6] The receiver may also prove to the liquidator it could not realize the value of all the secured creditors' charges through the secured assets, and seek the remainder from the liquidation process. Corporations Act s 554E(4).

**B.**

Under Chapter 15 "an order recognizing a foreign proceeding shall be entered if . . . such foreign proceeding for which recognition is sought is a foreign main proceeding" and the petition meets the administrative requirements of Section 1515. 11 U.S.C. § 1517(a). "'[F]oreign main proceeding' means a foreign proceeding pending in the country where the debtor has the center of its main interests." *Id.* § 1502(4).

> The term "foreign proceeding" means a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

*Id.* § 101(23). This definition can be broken down into seven elements: (i) a proceeding; (ii) that is either judicial or administrative; (iii) that is collective in nature; (iv) that is in a foreign country; (v) that is authorized or conducted under a law related to insolvency or the adjustment of debts; (vi) in which the debtor's assets and affairs are subject to the control or supervision of a foreign court; and (vii) which proceeding is for the purpose of reorganization or liquidation.

The Bankruptcy Court in this case thoroughly evaluated these elements and found they were met. RCS does not challenge that ABC has met the Section 1515 administrative requirements, nor that the liquidation is an

13

administrative proceeding in a foreign country for the purpose of liquidation, authorized under a law which relates to insolvency, and is subject to the supervision or control of Australian courts. The only other U.S. court that has considered Australian liquidation found it was a foreign main proceeding. *In re Betcorp Ltd.*, 400 B.R. 266, 285 (Bankr. D. Nev. 2009).

The Bankruptcy Court recognized the liquidation proceeding as the foreign main proceeding. RCS acknowledges that the liquidation is a collective proceeding, because the liquidator must consider the rights of all the creditors in distributing assets, and must distribute assets according to priorities on a pro rata basis. In this case, the practical effect of the receivership leaves little for the liquidator to administer, aside from investigating the charges claimed by the secured creditors.

RCS contends that only the receivership benefits from Chapter 15 recognition, so that only the receivership was effectively granted Chapter 15 recognition. The receivership is not a collective proceeding, because the receiver only represents the interests of the secured creditors. At oral argument, RCS conceded that an Australian liquidation proceeding operating parallel to a receivership could be granted Chapter 15 recognition "in a case where the secured creditors only have a portion of the assets." Oral Argument at 29:24, Mar. 5, 2013. Nevertheless, RCS asserts the receivership dominates the liquidation proceeding in this case because ABC's assets are entirely leveraged, leaving nothing for the liquidator to distribute to the unsecured creditors. But that does not affect the collective nature of the Australian liquidation proceeding. Instead, it turns on the particular facts

of ABC's debts.

Chapter 15 makes no exceptions when a debtor's assets are fully leveraged. Subject to the public policy exception, Chapter 15 recognition must be ordered when a court finds the requisite criteria are met,[7] replacing the Section 304 list of guiding principles.[8] We do not find any

---

[7]

> Subject to section 1506, after notice and a hearing, an order recognizing a foreign proceeding shall be entered if--
> (1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;
> (2) the foreign representative applying for recognition is a person or body; and
> (3) the petition meets the requirements of section 1515.

11 U.S.C. §1517(a).

[8]

> In determining whether to grant relief under subsection (b) of this section, the court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with--
> (1) just treatment of all holders of claims against or interests in such estate;
> (2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

exception to recognition based on the debtor's debt to value ratio at the time of insolvency. Moreover, we find such an exception could contravene the stated purposes of Chapter 15 and the mandatory language of Chapter 15 recognition.

## C.

"Nothing in [Chapter 15] prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506. RCS contends we should not recognize the liquidation proceeding or uphold the stay, because the receivership would gain all the benefits of the ordered relief, and because it is a non-collective proceeding which contravenes our public policy in favor of collective insolvency proceedings.

The public policy exception has been narrowly construed, because the "word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States." H.R. Rep. No.

---

(3) prevention of preferential or fraudulent dispositions of property of such estate;
(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;
(5) comity; and
(6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 304 (2000) *repealed by* Pub. L. 109-8. Title VIII, § 802(d)(3) (2005).

109–31(I), at 109 (2005) *reprinted in* U.S.C.C.A.N. 88, 172; *see also In re Ephedra Prods. Liab. Litig.*, 349 B.R. 333, 336 (S.D.N.Y. 2006) (explaining why the exception is a narrow one). "The purpose of the expression 'manifestly', . . . is to emphasize that public policy exceptions should be interpreted restrictively and that [the exception] is only intended to be invoked under exceptional circumstances concerning matters of fundamental importance for the enacting State." U.N. Comm'n on Int'l Trade Law, *Guide to Enactment of the UNCITRAL Model Law on Cross–Border Insolvency*, ¶ 89, U.N. Doc A/CN.9/442 (1997).

The public policy exception applies "where the procedural fairness of the foreign proceeding is in doubt or cannot be cured by the adoption of additional protections" or where recognition "would impinge severely a U.S. constitutional or statutory right." *In re Qimonda AG Bankr. Litig.*, 433 B.R. 547, 570 (E.D. Va. 2010). An Israeli insolvency proceeding was found to be manifestly contrary to public policy in *In re Gold & Honey, Ltd.*, because the receivership initiated in Israel after Chapter 11 proceeding began in the U.S. seized the debtor's assets, violating the bankruptcy court's stay order. 410 B.R. 357, 371-72 (Bankr. E.D.N.Y. 2009). This conduct hindered two fundamental policy objectives of the automatic stay: "preventing one creditor from obtaining an advantage over other creditors, and providing for the efficient and orderly distribution of a debtor's assets to all creditors in accordance with their relative priorities." *Id.* at 372 (discussing "serious ramifications" if future creditors followed suit and seized assets under a United States court's jurisdiction in violation of its orders). In *In re Ephedra Prods.* a Canadian insolvency proceeding was challenged under the public policy exception

because it did not afford a right to a jury trial. 349 B.R. at 335. Despite our constitutional right to a jury, Canada's lack of a right to a jury trial did not contravene a fundamental policy because the Canada proceedings afforded substantive and procedural due process protections, and "nothing more is required by § 1506 or any other law." *Id.* at 337.

The collective proceeding requirement reflects U.S. policy "'to provide an orderly liquidation procedure under which all creditors are treated equally.'" *In re Schimmelpenninck*, 183 F.3d 347, 351 (5th Cir. 1999) (quoting H.R. Rep. No. 95-595, 1st Sess., at 340 (1977)) ("Ultimately, the interests of all creditors, foreign and domestic, are to be put on a level playing field, with like-situated claimants being treated equally."). It is undisputed that the Australian liquidation proceeding is a collective proceeding. The liquidator must distribute assets on a pro-rata basis to creditors of the same priority. Secured creditors are entitled to recover the full value of their debts by realizing the value of the assets securing those debts and submitting an accounting to the liquidator.

Rather than contravene public policy, recognition advances the policies that animate the collective proceeding requirement. RCS seeks to attach assets before the secured creditors can realize them. Without Chapter 15 recognition, RCS could skip ahead of the priorities of the secured creditors. At oral argument, RCS contended this was fair to the other unsecured creditors, because they too could bring suits in the United States to attach ABC's assets. Oral Argument at 29:54, Mar. 5, 2013. RCS's approach would eviscerate the orderly liquidation proceeding, and ignores all priority of debts. Efficient, orderly and fair distribution are not only the policies

behind the collective proceeding requirement, but are some of the "chief purpose[s] of the bankruptcy laws." H.R. Rep. 95-595 1st Sess., at 345 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6006 n.380; *Katchen v. Landy*, 382 U.S. 323, 328 (1966). Without bankruptcy proceedings, creditors would race to the courthouse to collect from a troubled entity, depleting assets and enabling some creditors to collect fully on the debts and others not at all, and with no regard for priority. Accordingly, it would contravene our policy "to provide an orderly liquidation procedure under which all creditors are treated equally" if RCS could evade collecting its debt through the Australian liquidation proceeding.

Moreover, we are unconvinced the Australian insolvency proceeding conflicts with our own rules. The United States Bankruptcy Code prioritizes secured creditors, as does Australia's Corporations Act. 4 *Collier on Bankruptcy* ¶ 506.02 (16th ed. 2013). Several courts have refused to turn over assets under Section 304 to foreign insolvency proceedings that did not prioritize secured creditors. *In re Treco*, 240 F.3d 148, 159-60 (2d Cir. 2001) (refusing to turn over assets to a Bahamian liquidation proceeding because it prioritized administrative expenses over secured creditors, and summarizing other cases denying turnover because the foreign proceeding failed to sufficiently protect prioritized secured interests). The sole difference here is that Australian law allows secured creditors to realize the full value of their debts, and tender the excess to the company, whereas secured creditors in the United States must generally turn over assets and seek distribution from the bankruptcy estate.

The Dutch bankruptcy system also exempts secured creditors from surrendering their interests to the liquidation

process. *In re Schimmelpenninck*, 183 F.3d at 352. The Court of Appeals for the Fifth Circuit reviewed the Dutch proceedings under the precursor to Chapter 15, Section 304. *Id.* at 351. To enjoin actions against a foreign debtor's property, Section 304 required the estate to be distributed in manner substantially similar to Chapter 11 preferences. *Id.* at 365. The Fifth Circuit found the Dutch proceeding distributed assets in a manner "substantially in accordance with Title 11" even though it allowed a secured creditor who "holds either a mortgage or a pledge encumbering that asset [to] exercise his rights irrespective of the authority of the Curator." *Id.* ("Dutch bankruptcy law clearly is not repugnant to Title 11 . . . ."). The court further found if the unsecured creditor was permitted to bring suit he would "unjustly gain a first-come/first-served preference, [and] the remaining creditors . . . would suffer a concomitant disadvantage" which "would oppugn the very equitable foundation on which bankruptcy is built." *Id.* at 351-52.

Australia's Corporations Act prioritizes secured creditors with a mechanism similar to the Dutch bankruptcy regime, both allowing independent enforcement of secured interests outside the insolvency proceeding. Despite the different method chosen to create the priority, the Fifth Circuit found the Dutch proceeding was not "repugnant to [U.S.] laws and policies." *Id.* at 365 (finding "sufficient congruity between Dutch and American bankruptcy laws to eschew such repugnance"). The Australian legislators selected a different method to prioritize secured creditors. Rather than manifestly contravene our policy, Australian law established a different way to achieve similar goals. Recognition of the Australian liquidation proceeding does not manifestly contravene public policy. On the contrary, allowing RCS to use U.S. courts to

circumvent the Australian liquidation proceedings would undermine the core bankruptcy policies of ordered proceedings and equal treatment.

**D.**

Upon recognition of the foreign main proceeding, the automatic stay under Section 362 applies to multinational bankruptcies "with respect to the debtor and the property of the debtor that is within the territorial jurisdiction of the United States." 11 U.S.C. § 1520(a). Section 362 provides for an automatic stay of actions "against the debtor or against property of the estate." 11 U.S.C. § 362(a).[9] RCS seeks to enforce its state court verdict against ABC property located in the United States. RCS contends the secured creditors, not ABC, effectively own the property because the property is entirely leveraged, and the receiver has the right to use and dispose of those assets at its discretion. But the secured creditors' equitable interest in the property does not resolve the question of ABC's equitable interests.

RCS contends ABC's assets in the United States are not "property of the debtor" because ABC only holds bare legal title to those assets. This argument is based on the premise that ABC does not hold any equitable interest in its encumbered property because it is entirely leveraged.

---

[9] Although the stay is generally automatic, a court may modify, terminate or condition the stay on request of a party. 11 U.S.C. §362(d). In this case, the Bankruptcy Court modified the stay to allow RCS to bring its verdict to judgment.

We find ABC does retain equitable interest in its encumbered property. First, the receiver must repay any amount of the realized assets in excess of the value of the charges to ABC. Corporations Act s 554H. Second, ABC retains the right to redeem the encumbered property. *Id.* s 554F. Third, the liquidator may challenge the charges the receiver claims on company assets, and if the charges were found invalid, ABC would retain the encumbered property. *Recievership*, *supra* at 4. Since ABC retains equitable interests in its property, it is "property of the debtor" and is subject to the automatic stay under Section 1520(a).

## 1.

"The Bankruptcy Code does not define 'property of the debtor.'" *Begier v. I.R.S.*, 496 U.S. 53, 58 (1990). Outside of the Chapter 15 context, the Supreme Court has looked to Section 541 defining "property of the estate" to interpret "property of the debtor." *Id.* ("[T]he term 'property of the debtor' . . . is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings."). But under Chapter 15 a court does not create a separate bankruptcy estate. *In re Condor Ins. Ltd.*, 601 F.3d 319, 327 (5th Cir. 2010). Chapter 15 provides for an ancillary proceeding so the foreign representative does not need to file a new bankruptcy action in the United States. *Id.* at 320-21 (citing Clark, *supra*, at 35). Accordingly, courts interpreting Chapter 15 have not found Section 541 relevant to defining "property of the debtor." *In re Qimonda AG*, 482 B.R. 879, 887 (Bankr. E.D. Va. 2012) ("Upon recognition of a foreign main proceeding, an estate is not created, as Section 541 of the Bankruptcy Code is not among the enumerated Sections of the

Bankruptcy Code that become operative upon recognition under Section 1520."); *In re Lee*, 472 B.R. 156, 178 (Bankr. D. Mass. 2012) ("[N]either section 541(a) nor 541(c)(1) are applicable to a determination of property of the Hong Kong bankruptcy estates, and the determination of property of the estates must be made under Hong Kong law."); *In re Atlas Shipping A/S*, 404 B.R. 726, 739 (Bankr. S.D.N.Y. 2009) ("The statute refers to 'property of the debtor' to distinguish it from the 'property of the estate' that is created under § 541(a)."). On these facts, we need not decide whether Section 541 defines "property of the debtor." Here, ABC's property rights under Australia's Corporations Act would inform an application of Section 541(d). Under Australian law ABC holds several equitable interests in the property. Accordingly, even if we applied Section 541 to define "property of the debtor," Section 541(d) would not exclude ABC's property in the United States from a bankruptcy estate.

**2.**

RCS contends ABC's assets in the United States are not property of the debtor  because Section 541 defining "property of the estate" excludes assets in which the debtor holds empty title alone and no equity. RCS asserts ABC holds bare legal title alone because the full value of the assets are leveraged, and the receiver may use or dispose of the assets at will for the benefit of the secured creditors.[10]

---

[10] The Bankruptcy Court's Stay Order appears to apply to the receiver as well. In order to realize ABC assets in the United States, the receiver must go through the liquidator as the foreign representative.

Section 541 defines "property of the estate" as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541. Section 541(d) excludes property in which the debtor only holds legal title from the debtor's estate. 11 U.S.C. § 541(d). Section 541(d) provides:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d). This provision stands for the unremarkable proposition that property rights the debtor does not have do not become part of the bankruptcy estate. *See Matter of Cont'l Airlines, Inc.*, 134 B.R. 536, 541 (Bankr. D. Del. 1991); 124 Cong.Rec. H11096 (daily ed. Sept. 28, 1978) (statement of Congressman Edwards) ("To the extent that such an interest is limited in the hands of the debtor, it is equally limited in the hands of the estate. . . ."). It pertains to property such as secondary mortgages and assets the debtor holds in trust for a non-debtor. 5 *Collier on Bankruptcy* ¶ 541.29; *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 96

(3d Cir. 1994) (finding the debtor held employee income tax withholdings in a trust, and it was not property of the estate); *Cont'l Airlines, Inc.*, 134 B.R. at 541-42 ("Section 541(d) was enacted to protect the secondary mortgage market but has been read expansively to include express and constructive trusts as well." (citation omitted)). Section 541(d) "reiterates the general principle that where the debtor holds bare legal title without any equitable interest, . . . the estate acquires bare legal title without any equitable interest in the property." 124 Cong. Rec. 33999 (1978) (remarks of Sen. DeConcini).

RCS further contends that under Australia's Corporation's Act ABC does not hold any equitable interest in its fully-leveraged property. The only authority RCS cites for this proposition is a treatise on Australian insolvency law, stating "[t]he major practical effect of [debt] crystallization is that the debenture holder is given equitable interest in the property secured, which revokes the company's power to deal with such assets in the ordinary course of business." Michael Murray*, Australian Insolvency Management Pract.* ¶ 65-500 (CCH). A floating charge crystallizes and becomes a fixed charge upon default or appointment of a receiver.[11] In this case there is no question the receiver has the power to operate and manage ABC, and to use and dispose of its encumbered assets. The question is whether the receiver's control over the assets divests ABC of all equitable interests in them.

---

[11] A floating charge is a debt secured by interchangeable property, such as stocks that may be purchased or sold frequently. A fixed charge encumbers a specific item of property. In this case the secured creditors already held fixed charges in addition to the floating charges that crystallized when ABC went into Voluntary Administration.

Although the full value of ABC's assets are leveraged, ABC nevertheless holds several important equitable interests in its property. First, it has the right to surplus proceeds from the sale of the encumbered assets. In *United States v. Whiting Pools* the Supreme Court held assets the IRS seized to enforce its lien were part of the debtor's estate. 462 U.S. 198, 210 (1983). The IRS was authorized to seize and sell property belonging to the debtor to satisfy the lien imposed on that property, and took physical possession of the assets before the debtor filed for bankruptcy. *Id.* at 211. The Court held the property was property of the estate, in part, because the IRS was obligated to return to the debtor any proceeds from the sale that exceeded the value of the lien. *Id.* In *Whiting* it was unlikely there would be any surplus because the debt owed to the IRS was $92,000, but the liquidation value of the property seized was only $35,000. *Id.* at 200. Even though the IRS held an equitable interest in and a right to possess the property, "[o]wnership of the property is transferred only when the property is sold to a bona fide purchaser at a tax sale." *Id.* at 211.

The same obligation to pay any surplus from the sale of assets exists under Australia's Corporations Act. The receiver must pay to the company any proceeds from the sale of assets that exceed the value of the charge. *Recievership*, *supra*, at 2; Corporations Act s 441EA. Although both parties agree there will be no surplus from the sale of the assets, that same circumstance did not change the Supreme Court's analysis in *Whiting Pools*. Since the IRS's lien and control over the debtor's assets were insufficient to deprive the debtor of all equitable interests in *Whiting Pools*, the same would appear to be true of the charges and control over ABC's

assets before they are sold. Since the receiver did not sell ABC's assets in the United States, under U.S. bankruptcy law, the assets would be property of the estate and subject to the automatic stay under Section 362.[12]

Second, ABC retains the right of redemption under Australia's Corporations Act. Corporations Act s 554F(2) ("The liquidator may, at any time, redeem the security interest on payment to the creditor of the amount of the creditor's estimate of its value."). U.S. bankruptcy courts consistently recognize the right of redemption as an equitable interest in property, which must be turned over to the debtor's estate. *In re Moffett*, 356 F.3d 518, 521-22 (4th Cir. 2004); *Charles R. Hall Motors, Inc. v. Lewis*, 137 F.3d 1280, 1284-85 (11th Cir. 1998); 5 *Collier on Bankruptcy* ¶ 541.05. We also find ABC's right of redemption is an equitable interest. Accordingly, Section 541(d) does not exclude ABC's property in the United States from "property of the debtor" because ABC holds more than bare legal title to the property. Since ABC's assets in the United States are "property of the debtor" they are subject to the automatic stay under 11 U.S.C. § 1520.

## III.

RCS could not enforce its judgment against ABC under either the U.S. or Australian insolvency regimes. RCS

---

[12] We note that this comparison is somewhat strained because secured creditors must surrender the assets securing their debts under U.S. bankruptcy law, but not under Australia's Corporations Act. This illustrates one of the challenges of using Section 541 to define "property of the debtor" in the Chapter 15 context.

is an unsecured creditor. Under Australia's Corporation's Act, an unsecured creditor must recover its judgment against ABC through the liquidation proceeding. Under the U.S. Bankruptcy Code an unsecured creditor must seek to recover a judgment through the bankruptcy estate. Allowing an unsecured creditor to recover a judgment under these circumstances would require a hodgepodge of United States and Australian bankruptcy law. This is one of the outcomes Chapter 15 was designed to prevent by recognizing foreign main proceedings in United States courts.

For the foregoing reasons we will affirm the District Court's order affirming the Bankruptcy Court's order recognizing the Australian liquidation proceeding as a foreign main proceeding, and accompanying orders.